## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

WANDA M. MORGAN,    )
           )
    **Plaintiff,**   )
           )
**v.**          )   **CIVIL ACTION NO. 5:08-00052**
           )
**MICHAEL J. ASTRUE,**   )
**Commissioner of Social Security,** )
           )
    **Defendant.**  )

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 14.) Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 7 and 8.)

The Plaintiff, Wanda M. Morgan (hereinafter referred to as "Claimant"), filed an application

for DIB on August 16, 2004 (protective filing date), alleging disability as of August 3, 2004, due to

fibromyalgia, Wolff-Parksinon-White Syndrome, chronic fatigue syndrome, heart murmur, and heel

tendinitis.[1] (Tr. at 13, 50, 121-22.) The claim was denied initially and on reconsideration. (Tr. at 23-

25, 30-32.) On July 11, 2005, Claimant requested a hearing before an Administrative Law Judge

---

[1] On her "Disability Report - Appeal," dated April 8, 2005, Claimant the following additional disabling impairments: "numbness and pain in hands and legs, muscle pain and joint pain, still not sleeping, . . . [and] high cholesterol and triglycerides." (Tr. at 30, 94.) In a subsequent Report dated July 6, 2005, Claimant reported the further disabling impairments: "having headaches daily, bursitis with knees, continue to worsen with hands, back, legs, muscle and joint pain, and fingers. Don't swallow as good. . . . Breathing difficulties, ankles and feet swelling." (Tr. at 102.)

(ALJ). (Tr. at 33.) The hearing was held on April 12, 2006, before the Honorable Mark A. O'Hara. (Tr. at 421-83.) By decision dated September 22, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-20.) The ALJ's decision became the final decision of the Commissioner on November 27, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On January 23, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

2

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since August 3, 2004, her alleged onset date. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from a fibromyalgia, scoliosis, residuals of Wolf-Parkinson-White ("WPW") syndrome, carpal tunnel syndrome, degenerative joint disease of the fingers, and asthma, which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for sedentary and light exertional work as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary and light work, i.e., she can sit, stand and walk for prolonged period throughout an eight-hour day with appropriate breaks, and lift and carry up to 10 pounds frequently and 20 pounds occasionally. She can occasionally engage in postural activities (such as climbing, balancing, stooping, kneeling, crouching and crawling), but she should avoid repetitive use of her extremities to push and pull, repetitive bending and lifting, concentrated exposure to extreme cold, vibration, asthma irritants, and hazards, such as heights and moving machinery.

(Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant could return to her past relevant work as a receptionist. (Tr. at 19, Finding No. 6.) On this basis, benefits were denied. (Tr. at 20,

Finding No. 7.)

Scope of Review

      The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

      A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

      Claimant was born on November 22, 1950, and was 55 years old at the time of the administrative hearing, April 12, 2006. (Tr. at 427.) Claimant had a Generalized Equivalency Diploma and training as a certified nursing assistant ("CNA"). (Tr. at 127, 427.) In the past, she worked as an administrative clerk, a CNA, receptionist, billing clerk, appointment clerk, sales representative, and cashier. (Tr. at 76-82, 109-20, 122-23, 428-35, 475.)

4

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) evaluating Claimant's symptoms and pain, (2) not giving great weight to the opinion of Claimant's treating physician, and (3) relying upon a hypothetical question to the VE which did not set out fairly all the evidence regarding Claimant's impairments. (Document No. 13 at 13-17.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 14 at 11-18.)

Analysis.

1. Pain and Credibility & Listing Impairment.

Claimant first alleges that the ALJ "incorrectly evaluated her symptoms including pain." (Document No. 13 at 13-16.) In so arguing, Claimant specifically alleges that the ALJ erred  by finding at step one of the pain and credibility assessment that only her severe impairments affected her ability to perform work activities. (Id. at 13.) Claimant points out that the ALJ failed to find that her anxiety, depression, and plantar fasciitis were severe impairments, and therefore, did not consider her subjective complaints resulting from these conditions. (Id. at 13-14.) Claimant notes her testimony that she experienced crying spells, had problems with her concentration, and had difficulty being around others. (Id. at 13.) Claimant also asserts that the ALJ erred in finding that her carpal tunnel syndrome ("CTS") did not result in functional limitations precluding her work as a receptionist. (Id. at 14.) She asserts that her CTS "affected her ability to type and perform clerical activities." (Id.) Finally, Claimant asserts that the ALJ erred in not crediting the severity, frequency,

or limiting effects of Claimant's reported symptoms of fibromyalgia. (Id. 15-16.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 14 at 11-16.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the

"type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to

alleviate pain or other symptoms" in assessing the credibility of an individual's statements.

Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as

step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a

claimant's ability to function along with the objective medical and other evidence in determining

8

whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 17.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to generally produce the alleged symptoms." (Id.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 17-19.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 17.)

9

A. *Anxiety and Depression*.

Claimant essentially argues that the ALJ failed to consider the alleged functional limitations resulting from her anxiety and depression because he determined that the conditions were non-severe impairments. (Document No. 13 at 13-14.) Claimant notes however, that she testified to having experienced crying spells, problems with concentration, and difficulty being around others. (Id. at 13.) She further noted that she took Zoloft and Buspar for anxiety and depression, was depressed for five to ten years, and that these mental conditions affected her concentration and memory. (Id. at 14.) The Commissioner asserts that the ALJ acknowledged Claimant's testimony, but properly determined that these conditions were non-severe impairments because she had never treated with any mental health professionals, had normal clinical findings, and that the medical source notes failed to support her subjective complaints of concentration deficits or memory loss. (Document No. 14 at 12-13.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);  416.920(c) (2006). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations;  and  dealing  with  changes  in  a  routine  work  setting. Id.;  §§  404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is

probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

The medical evidence of record reveals that Claimant received no mental health treatment from a psychiatrist or psychologist. Nevertheless, on November 20, 2001, and June 14, 2002, Claimant's former treating physicians, Dr. Abigail Winters, D.O., and Dr. Debra C. Sams, D.O., diagnosed depression, for which she was being treated with Zoloft. (Tr. at 16, 212, 224.) On July 30, 2002, it was noted that Claimant had increased anxiety and on March 1, 2002, her Zoloft was increased, which Claimant reported on March 4, 2002, that had helped and that she felt better. (Tr. at 16, 199, 210.) On February 12, 2003, Claimant reported her belief that occasional chest pressure was anxiety and she was started on Buspar 15mg. (Tr. at 16, 161.) On October 8, 2003, and March 30, 2004, Dr. Saikali noted that Claimant's anxiety and depression was only mild in nature (Tr. at 145-46.), and on June 1, 2004, he noted that these conditions were improving. (Tr. at 142.) Dr. Lemmer, Claimant's treating physician, noted that Claimant's anxiety syndrome had improved. (Tr. at 389.) On August 3, 2004, Dr. Lemmer assessed moderately severe depression with sleep disturbance and mild memory disturbance, possibly from "fiber fog." (Tr. at 380.) As the Commissioner notes, the corresponding treatment notes contain no clinical findings to support this diagnosis and state that Claimant was "alert and oriented." (Tr. at 381.) On October 1 and November 11, 2004, as well as on April 20, 2005, Dr. Lemmer noted that Claimant's anxiety and depression had improved. (Tr. at 372, 375-76.) On June 20, 2005, Dr. Lemmer assessed that Claimant's anxiety and depression were treated. (Tr. at 372.) However, on March 2, 2006, Dr. Lemmer assessed that Claimant's anxiety syndrome was improved (Tr. at 389.), and on April 7, 2006, he opined that Claimant had difficulty with concentration and memory. (Tr. at 387.)

11

In his decision, the ALJ noted Claimant's testimony of crying spells, problems with concentration, and difficulty being around others. (Tr. at 16.) He also noted her diagnosis of anxiety. (Id.) However, the ALJ further noted that Claimant had never been referred to a psychiatrist, that findings on mental status examinations were within normal limits, and that there was no evidence of functional limitations related to a mental disorder. (Id.)

The Court finds that in assessing Claimant's credibility, the ALJ properly considered the lack of mental health treatment. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As indicated by the medical evidence and summarized above, Claimant was treated for depression and anxiety with Zoloft and Buspar, her mental conditions improved, and mental status examinations essentially were normal. Furthermore, the medical record contains no clinical indication that she suffered problems with concentration and memory. The only references to such problems stem from Claimant's subjective complaints to her medical providers. Accordingly, the undersigned finds that the ALJ's decision that Claimant's anxiety and depression were non-severe impairments and did not result in any significant functional limitations is supported by substantial evidence.

B. *Plantar Fasciitis.*

Claimant next argues that the ALJ erred in finding her not credible regarding the alleged disabling effects of plantar fasciitis. (Document No. 13 at 14.) The Commissioner asserts that the ALJ noted that Claimant successfully treated her plantar fasciitis, and therefore, "no ongoing evidence of functional limitations existed from this short-term impairment." (Document No. 14 at 13.)

The medical evidence of record reveals that Claimant was diagnosed with plantar fasciitis for which she received injections in her heel. Claimant testified that she experienced heel pain as a symptom of fibromyalgia and that she could not tolerate anything, including shoes, to touch her feet. (Tr. at 437.) Other than the intolerance to touch, the medical record contains no reference to any

12

limitations resulting from Claimant's heel pain. She did not testify that the heel pain prevented her from walking or standing; she only stated that she could not stand anything to touch the bottom of her feet or heels. The ALJ noted in his decision that Claimant's heel pain responded to treatment and that there was no evidence of ongoing functional limitations related to the condition. (Tr. at 15.) On January 3, 2006, Dr. Morgan noted that Claimant's plantar fascia problem was much better, though she reported a little discomfort. (Tr. at 384.) Dr. Morgan suggested that she wear plantar fascial night splints. (Id.) Dr. Lemmer noted on March 2, 2006, that Claimant's heel tendinitis had improved and on April 3, 2006, that she had heel pain, which probably was plantar fasciitis. (Tr. at 388-89.) Nevertheless, he recommended a walking program. (Tr. at 388.) Accordingly, the Court finds that the ALJ's decision that Claimant's plantar fasciitis resulted in no significant functional limitations is supported by substantial evidence.

C. *Fibromyalgia.*

Claimant also argues that the ALJ "ignored the medical evidence and corroborating evidence" of Claimant's symptoms of fibromyalgia, including her subjective complaints of fatigue, sleep difficulty, low back pain, muscle stiffness and pain, multiple joint pain, leg pain and burning, swelling in her left knee, and mild morning stiffness. (Document No. 13 at 15.) The Commissioner first asserts that the clinical findings of Claimant's treating physicians contradicted her allegations of disabling symptoms of fibromyalgia. (Document No. 14 at 14.) Despite allegations of muscle tenderness and some decreased range of motion, the treatment notes reflected generally full range of motion, well preserved sensory modalities, a steady gait without evidence of a limp, the ability to sit comfortably and to squat, the ability to write without difficulty, and full strength in her arms and legs without muscle weakness or atrophy. (Id.) Next, the Commissioner asserts that the ALJ noted that Claimant's subjective complaints of pain improved with "creams, cooling agents, medications, and

13

occasional injections." (<u>Id.</u>) Finally, the Commissioner asserts that the ALJ properly noted that Claimant's reported activities of daily living were inconsistent with allegations of work preclusive pain. (<u>Id.</u>)

Regarding Claimant's fibromyalgia, the ALJ, in assessing Claimant's pain and credibility, stated as follows:

> Treatment records reflect the claimant's subjective complaints of fatigability, difficulty sleeping, low back pain, muscle stiffness and pain, pain in multiple joints, pain in her legs with occasional burning sensation, swelling in her left knee toward the end of the day, and mild morning stiffness, but the evidence does not support that her symptoms are as severe, frequent, or limiting as alleged. Examinations revealed tenderness in her muscles, trigger points consistent with fibromyalgia, and some decreased range of motion in the affected joints, but range of motion was deemed satisfactory, all sensory modalities were well-preserved, she walked steadily without evidence of a limp, she exhibited an ability to sit comfortably, she could squat (albeit with difficulty), she demonstrated an ability to write without difficulty, and she had normal strength in her bilateral upper and lower extremities with no weakness or muscle atrophy (which could reasonably be expected if the claimant were as limited as she alleged). Such pain as she experienced improved with creams, cooling agents, medications, and an occasional injection, and treatment recommendations were primarily for exercise, stretching, and a walking program (Exhibits 2F-3F, 5F, 12F-14F).

The medical evidence, which is discussed below in part, reveals that contrary to Claimant's allegations, her fibromyalgia resulted in only some decreased range of motion in the affected joints, but that sensation was intact, she walked steadily without a limp, she was able to write without difficulty, and that she exhibited full strength in her extremities without signs of muscle weakness or atrophy. (Tr. at 18.) Furthermore, as the ALJ noted, Claimant's symptoms were improved with creams, cooling agents, medications, and an occasional injection. (Tr at 18.) Finally, Claimant's reported activities of daily living, which included caring for her personal needs, preparing simple meals, performing household chores, visiting, mowing the grass for exercise, watering outside plants, driving, and helping her husband put a transmission in a car. (Tr. at 18.) In view of the foregoing, and

14

the summary of the evidence below, the Court finds that the evidence of record does not support Claimant's alleged severe functional limitations resulting from her fibromyalgia, and that substantial evidence supports the ALJ's assessment of the severity of her symptoms.

      *D. CTS.*

Finally, Claimant argues that her CTS affected her ability to perform typing and clerical duties required of a receptionist. (Document No. 13 at 14.) The Commissioner asserts that the ALJ acknowledged Claimant's complaints and diagnostic test results, but noted that her wrist and hand problems received only conservative treatment including splints and medication, and the examinations of her hands and wrists essentially were normal. (Document No. 14 at 15.) The ALJ further noted that Claimant was able to write without difficulty, and reported that she sewed when necessary, used a checkbook, dressed herself, did laundry, used a lawn mower, and assisted her husband with automotive work. (Id.) These functions reflected an ability to perform fine and gross manipulations. (Id.) Furthermore, Claimant's treating physician, Dr. Lemmer, categorized Claimant's CTS as only mildly symptomatic and Dr. Gobunsuy, found that Claimant's ability to perform fine manipulation was normal. (Id.) Nevertheless, the ALJ credited Claimant's complaints by eliminating repetitive pushing and pulling with her arms. (Id. at 15-16.)

In his decision, the ALJ noted that Claimant's CTS was treated conservatively with medications and the use of supporting devices, such as splints. (Tr. at 18.) Examinations revealed no active swelling or sensory, range of motion, or strength deficits in her hands. (Tr. at 18.) Claimant was capable of writing with her right, dominant hand without difficulty. (Tr. at 18.) Additionally, she used her hands for sewing, using a checkbook, dressing herself, driving, doing the laundry, mowing the grass, and assisting with automotive work. (Tr. at 18, 60, 62-64, 238, 328, 345.)   As the Commissioner points out, Dr. Lemmer, Claimant's treating physician, categorized Claimant's CTS

15

as only mildly symptomatic. (Tr. at 389.) Likewise, Dr. Gobunsuy found that Claimant's ranges of wrist motion were only mildly reduced and that she was able to write her name without difficulty using her right, dominant hand. (Tr. at 238, 240.) Nevertheless, in his RFC assessment, the ALJ credited Claimant's complaints to the extent that he restricted her from repetitive use of her extremities to push and pull or bend and lift. (Tr. at 16, Finding No. 5.) Accordingly, the Court finds that substantial evidence supports the ALJ's credibility assessment regarding Claimant's CTS and finds that Claimant's argument to the contrary is without merit.

2. <u>Treating Physician Opinion</u>.

Second, Claimant alleges that the ALJ erred in not giving controlling weight to the April 7, 2006, opinion of her treating physician, Dr. Lemmer. (Document No. 13 at 16-17.) Claimant asserts:

> Dr. Lemmer's records were actually used by the Administrative Law Judge to find that the claimant did not have a severe mental impairment. (Tr. 387). If Dr. Lemmer's opinion was giving controlling weight, it is clear that the claimant will not be able to perform her job as receptionist due to an allowance for frequent absences due to flares in pain and fatigue and problems with concentration and memory. (Tr. 387). Clearly the allowances of frequent absences due to flares in pain and fatigue would prohibit the claimant from performing any type of sustained gainful employment. (Tr. 387).

(<u>Id.</u> at 16-17.)

The Commissioner asserts that substantial evidence supports the weight that the ALJ gave to the April 7, 2006, opinion rendered by Dr. Lemmer. (Document No. 14 at 16-17.) The Commissioner notes that the ALJ's assessed RFC is consistent with Dr. Lemmer's assessment, except for Dr. Lemmer's "unsupported assertion that Plaintiff would have frequent absences from work due to 'flares' in pain and fatigue, and that she would have difficulty with concentration and memory." (<u>Id.</u> at 16.) The Commissioner asserts that Dr. Lemmer treated Claimant only on eleven occasions over a nearly two-year period of time from her alleged onset date. (<u>Id.</u>) The infrequency of Claimant's visits to Dr. Lemmer "undermines his speculative opinion that Plaintiff would have frequent,

16

debilitating flare-ups which would necessitate absences from work." (<u>Id.</u> at 16-17.) The Commissioner notes that if Claimant was having debilitating flare-ups with great frequency, "one would expect that: (1) she would have treated more frequently with Dr. Lemmer; (2) debilitating flare-ups would presumably be reflected in Dr. Lemmer's eleven treatment notes; and (3) she would have required occasional emergency room treatment or hospitalizations." (<u>Id.</u> at 17.) The Commissioner further notes that Dr. Lemmer's treatment notes reflect only one occasion of mild memory problems. (<u>Id.</u>) Dr. Lemmer's lack of referral of Claimant to any specialists for testing of deficits in memory or concentration undermine his statement regarding Claimant's purported loss of memory or concentration. (<u>Id.</u>) Thus, the Commissioner contends that substantial evidence supports the ALJ's decision. (<u>Id.</u>)

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2));

rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." <u>Id.</u> §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." <u>See</u> 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. <u>See</u> Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." <u>Id.</u> SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." <u>Id.</u> at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the

Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight

only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The evidence of record reflects Claimant's treatment with Dr. Joseph P. Lemmer, M.D., from August 3, 2004, through April 7, 2006. (Tr. at 250-71, 368-82, 387-91.) On August 3, 2004, Dr. Lemmer examined Claimant at her own request. (Tr. at 269-71.) Claimant reported a history of generalized myalgias and arthralgias. (Tr. at 269.) Specifically, she complained of back, heel, knee, leg, shoulder, and hip pain, as well as sleep difficulty, fatigue, and stress. (Id.) Claimant indicated that the pain was aggravated by fatigue, stress, and overdoing it, and was made better with creams, cooling agents, Xanax, and Neurontin. (Id.) Her pain was unaffected by weather changes and physical therapy. (Id.) Physical examination was normal with full range of motion, except for moderate tenderness of the heel, back, elbows, knees, and hips. (Tr. at 270.) Dr. Lemmer's diagnoses included diffuse myalgias and arthralgias consistent with fibromyalgia, probable tendinitis of the heels, moderately severe "anxious depression" with sleep disturbance, and possible CTS, to list a few. (Tr.

at 271.)

During a follow-up visit on September 3, 2004, Dr. Lemmer assessed moderate to severe fibromyalgia syndrome, heel pain, "anxious depression" with sleep disturbance, and hand numbness probably due to CTS. (Tr. at 268.) He prescribed wrist splints, arch supports, and heel pads, and continued Claimant's medical leave for one month. (Id.) Dr. Lemmer also recommended heat, massage, stretching exercises, and stress reduction. (Id.)

On October 1, 2004, Dr. Lemmer reported that Claimant's persistent diffuse pain, sleep disturbance, and fatigue all were somewhat improved. (Tr. at 378.) On physical exam, Dr. Lemmer noted that Claimant had full range of motion without pain or swelling in the hands. (Tr. at 265.) Dr. Lemmer continues his diagnoses but noted that the conditions were improved. (Tr. at 378.) On November 23, 2004, Dr. Lemmer noted that Claimant was feeling better with decreased foot pain and improved sleep. (Tr. at 262.) He also noted that Claimant was "no longer working." (Id.) On exam, Claimant had full range of motion except slightly decreased range of shoulder and neck motion on the left, without pain or swelling. (Tr. at 263.) Dr. Lemmer's diagnoses included diffuse myalgias and arthralgias with tender points consistent with fibromyalgia syndrome; improved plantar fasciitis, "anxious depression," and sleep disturbance; and unchanged hand numbness, probable CTS. (Tr. at 377.) Dr. Lemmer prescribed exercise on a treadmill, stress reduction, sleep improvement, massage, heat, and stretching. (Id.)

Claimant followed up with Dr. Lemmer three and one half months later on March 7, 2005, at which time she reported increased hand numbness, variable myalgias, improved heel pain, and anxiety triggered by a death in the family. (Tr. at 256-57.) Dr. Lemmer recommended the use of wrist splints, as well as heat, massage, stretching exercises, a regular exercise program, stress reduction, and improved sleep. (Tr. at 256.) He also ordered an EMG and nerve conduction studies of the

median nerve, which were conducted on April 6, 2005. (Tr. at 253-54, 256.) The studies revealed moderate left sided CTS and mild right sided CTS. (Tr. at 253.) On April 20, 2005, Dr. Lemmer assessed Claimant's heel tendinitis and "anxious depression" as improved. (Tr. at 252.) He advised Claimant to wear wrist splints day and night and administered an injection to her wrists, which consisted of a mixture of Lidocaine and Triamcinolone Acetonide. (Id.) Regarding Claimant's disability, Dr. Lemmer opined that Claimant's limitations were moderate. (Tr. at 250.)

On June 20, 2005, Dr. Lemmer assessed that Claimant's fibromyalgia syndrome was unchanged, that her heel tendinitis had improved, and that her "anxious depression" was treated. (Tr. at 372.) He directed that Claimant participate in water aerobics and a walking program, together with massage, heat, stretching, stress reduction, and improved sleep. (Id.) On August 22, 2005, Claimant complained of generalized myalgias and arthralgias with increasing plantar and heel pain. (Tr. at 371.) Dr. Lemmer diagnosed moderate and unchanged fibromyalgia syndrome, recent onset of left knee pain possibly due to osteoarthritis, asthma, anxious depression, and possible CTS. (Id.) He recommended that Claimant use arch supports, heel pads, one inch heels, and open back shoes in an effort to reduce heel pain. (Id.) On January 12, 2006, Claimant complained of right hand and finger, left leg, and low back pain. (Tr. at 369.) She also reported complaints of fatigue, popping of the left knee, and poor sleep. (Id.) Physical examination revealed only decreased range of cervical spine motion with pain. (Tr. at 370.) On March 2, 2006, Claimant complained of varying myalgias and arthralgias, particularly on walking, as well as headaches, chronic back pain, aching of the finger joints, and poor sleep. (Tr. at 389.) Dr. Lemmer diagnosed fibromyalgia syndrome with worsening pain in the left anserine bursa region; improved heel tendinitis and anxiety syndrome; mild CTS, left greater than the right; sleep disturbance; osteoarthritis of the fingers; recurrent headaches; dyspepsia; and history of asthma. (Id.) He adjusted Claimant's medications and recommended moist head, low

22

back exercises, caffeine restriction, sleep improvement, stress reduction, heat, massage, and exercise. (Id.)

On April 3, 2006, Dr. Lemmer assessed that Claimant's fibromyalgia syndrome was somewhat worsened but that her CTS had improved. (Tr. at 388.) His recommendations included, inter alia, a walking program and formal physical therapy. (Id.) On April 7, 2006, Dr. Lemmer wrote a letter at the request of Claimant's counsel, which stated that Claimant's work related limitations included "avoidance of repetitive bending and lifting, repetitive use of the arms and legs, lifting greater than 10 pounds, and allowances for frequent absences from work due to flares in pain and fatigue." (Tr. at 387.) He also noted that Claimant had difficulty with maintaining concentration, memory, and her energy level. (Id.) Dr. Lemmer listed her impairments to include fibromyalgia syndrome, heel pain, anxiety syndrome, CTS, dyspepsia, osteoarthritis of the fingers, and headaches. (Id.)

In addition to Dr. Lemmer's April 7, 2006, opinion, the medical record included the form Physical Residual Functional Capacity Assessments of Dr. Amy Wirts, M.D. and Dr. Rogelio T. Lim, M.D., dated March 29, 2005, and June 24, 2005, respectively. (Tr. at 242-49, 317-24.) Dr. Wirts opined that Claimant's Wolff-Parkinson-White syndrome, fibromyalgia, and osteoarthritis of the bilateral hands limited her to performing light level work with occasional postural limitations and avoidance of concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 242-46.) Dr. Lim likewise opined that Claimant was limited to performing light level work with occasional postural limitations and an avoidance of concentrated exposure to extreme cold, vibration, and fumes, odors, dusts, gases, and poor ventilation. (Tr. at 317-21.) Dr. Lim acknowledged Claimant's WPW syndrome, but determined that it was treated with ablation treatment with good results and that the evidence failed to demonstrate recurrence of severe arrhythmia and only occasional palpitation. (Tr.

23

at 322.) Regarding Claimant's osteoarthritis of the hands, Dr. Lim noted that it was mild in nature and that Claimant retained normal hand grip. (Id.) Dr. Lim also noted Claimant's allegations of asthma, but found no documentation of severe exacerbation. (Id.)

Furthermore, on March 3, 2005, Dr. Rodolfo Gobunsuy, M.D., conducted a consultative evaluation of Claimant at the request of the State Agency. (Tr. at 236-41.) Claimant reported having been diagnosed with Wolff-Parkinson-White syndrome in 1990. (Tr. at 236.) She had ablation therapy and reported only occasional rapid heartbeat when she was under stress. (Id.) Dr. Gobunsuy's cardiovascular examination was normal and revealed a regular heart rate of 82 beats per minute. (Tr. at 238-39.) Claimant also reported being diagnosed with fibromyalgia by Dr. Saikali, a rheumatologist. (Tr. at 236.) She complained of fatigability, difficulty sleeping, tiredness, muscle pains, joint pains, muscle stiffness, and muscle burning. (Id.) She reported that household chores made her symptoms worse. (Tr. at 236-37.) On physical examination, Dr. Gobunsuy observed that Claimant walked steadily without obvious limp or antalgia, though she had difficulty arising from a seated position. (Tr. at 237.) Dr. Gobunsuy observed no muscle weakness or atrophy and intact sensation, including light touch and pinprick. (Tr. at 238.) Claimant was able to walk on her heels and toes, walk heel-to-toe, and squat, but with difficulty. (Id.) Claimant was able to stand on one leg at a time and write her name with the right hand, her dominant hand, without difficulty. (Tr. at 237-38.) Claimant exhibited tenderness of the thoracolumbar spine from T4-T6 and of the lumbar spine from L1 down to the mid-sacral level, without muscle spasms. (Id.) Claimant had tenderness in various parts of her body, which was indicative of fibromyalgia. (Id.) However, Dr. Gobunsuy observed that the range of motion of the affected joints was satisfactory. (Id.)

Claimant also sought treatment from Dr. Ashfaq A. Ahsanuddin, M.D., at Greenbrier Physicians, Inc., from December 15, 2003, through March 7, 2006, primarily for complaints of back,

knee, and heel pain. (Tr. at 325-38, 383-86.) On September 13, 2005, Dr. Ahsanuddin recommended

an exercise program due to deconditioning resulting from fibromyalgia and osteoarthritis. (Tr. at

385.) On January 3, 2006, it was noted that Claimant's knee was "fair," and that her plantar fasciitis

had improved. (Tr. at 384.)

The medical record also contains the form Physical Residual Functional Capacity

Assessments completed by Dr. Amy Wirts, M.D., and Dr. Rogelio T. Lim, M.D., on March 29 and

June 24, 2005, respectively. (Tr. at 242-49, 317-24.) Dr. Wirts opined that due to Claimant's WPW,

fibromyalgia, and early osteoarthritis of the bilateral hands, she was limited to performing work at

the light exertional level that involved only occasional postural limitations, and an avoidance of

concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 242-46.) Dr. Wirts did not

assess any manipulative limitations. (Tr. at 245.) Dr. Lim opined that Claimant was limited to light

exertional level work with occasional postural limitations, no manipulative limitations, and an

avoidance of extreme cold, vibration, and fumes, odors, dusts, gases, or poor ventilation. (Tr. at 317-

21.)

The ALJ summarized the medical and opinion evidence of record and accorded "appropriate,

but not controlling weight" to the opinion of Dr. Lemmer. (Tr. at 19.) The ALJ determined that the

evidence as a whole did not reflect frequent flares that would account for Dr.Lemmer's opinion

regarding the frequency of absences from work. (Id.) The ALJ also determined Dr. Lemmer's opinion

regarding Claimant's concentration and memory problems was not supported by the evidence of

record. (Id.) Furthermore, the ALJ interpreted Dr. Lemmer's opinion regarding the repetitive use of

Claimant's arms and legs to mean that Claimant could not perform repetitive pushing or pulling. (Id.)

However, the ALJ found that the minimal to moderate findings on diagnostic tests and Claimant's

admitted activities do not support Dr. Lemmer's opinion that Claimant was precluded from all

25

repetitive use of her extremities. (Id.)

As discussed above, Dr. Lemmer's treatment notes reflect Claimant's various reports of pain and other symptoms. However, his treatment notes do not indicate the severity or frequency of any flare-ups that would cause Claimant to have frequent absences from work. As the Commissioner notes, since August 3, 2004, Claimant's alleged onset date, Dr. Lemmer examined Claimant less than on fifteen occasions over a period of nearly two years, as reported in his April 7, 2006, letter/opinion. Thus, Claimant's visits to Dr. Lemmer were somewhat infrequent, which undermines his opinion that Claimant would have frequent debilitating flare-ups resulting absences from work. Furthermore, the other medical evidence of record does not demonstrate that Claimant's "flare-ups" were documented by other medical source providers or were so severe that Claimant had to seek emergency treatment or hospitalizations.

Regarding Claimant's memory and concentration, the ALJ properly found that Dr. Lemmer's treatment notes did not reference Claimant's alleged difficulties in concentration or memory. Likewise, the other medical evidence of record, primarily in the form of mental status exams, did not reveal such debilitating problems with Claimant's memory and concentration. Accordingly, the Court finds that the ALJ's decision to give Dr. Lemmer's opinion appropriate, but not controlling, weight is supported by the substantial evidence of record.

3. Vocational Expert Testimony.

Finally, Claimant alleges that the ALJ failed to posit a hypothetical question to the VE that included all of Claimant's impairments. (Document No. 13 at 17.) Specifically, Claimant argues that had the ALJ included in his hypothetical questions the limitations of no use of the arms for reaching and handling, no sitting for longer than ten minutes, and an inability to maintain attention and concentration for periods long enough to complete tasks, Claimant would have been found unable

to perform her past relevant work. (Id.) The Commissioner asserts that the functional limitations which Claimant seeks to include were unsupported by clinical findings of her treating doctors and the other evidence of record, and therefore, the ALJ was not required to include such limitations in his hypothetical questions. (Document No. 14 at 17-18.) The Commissioner asserts that the evidence supports the ALJ's RFC assessment, and therefore, his corresponding hypothetical questions accurately reflected Claimant's functional limitations to the VE. (Id. at 18.) "Because the ALJ's hypothetical question accounted for [Claimant's] functional limitations, the VE testimony constitutes substantial evidence supporting the ALJ's decision that [Claimant] was not disabled." (Id.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 477-80.) The ALJ first asked whether an individual limited to performing light exertional level work, with unlimited ability to push or pull; occasional postural limitations; and environmental restrictions including an avoidance of concentrated exposure to extreme cold, vibration, and asthma irritant, could perform Claimant's past relevant work. (Tr. at

27

477.) The VE responded that with the exception of the CNA work, the individual could perform Claimant's past relevant work. (Id.) The ALJ then asked whether the VE's response would be altered with the additional limitations that the individual avoid concentrated exposure to hazards, such as heights and moving machinery. (Tr. at 478.) The VE responded that these additional limitations did not change his response. (Id.) The ALJ then asked whether an individual limited to performing sedentary work that involved unlimited pushing and pulling, occasional postural activities, and avoidance of concentrated exposure to extreme cold, vibration, and asthma irritants, could perform Claimant's past relevant work. (Id.) The VE responded that the individual could do the work as a receptionist. (Id.) Next, the ALJ asked whether an individual limited to sedentary work with no repetitive bending and lifting or use of the arms and legs could perform Claimant's past relevant work. (Tr. at 479.) The VE responded that the individual could not perform any of Claimant's past relevant work without use of the arms and legs because the jobs required frequent use of the arms for reaching and handling. (Id.) The ALJ then asked whether the VE's response would be altered if the pushing and pulling limitation was reduced to none rather than repetitive. (Id.) The VE responded that his answer would not be changed. (Id.) Finally, the ALJ asked whether there would be any jobs available for an individual if the impairments were such that the individual was incapable of completing competitive work on a sustained basis. (Tr. at 480.) The VE responded that such an individual would not be able to perform any work. (Id.)

Based on the foregoing, and contrary to Claimant's allegations, the ALJ presented a hypothetical question to the VE that contained the physical and mental limitations supported by the record. The limitations cited by Claimant are more restrictive than those limitations assessed by Dr. Lemmer.  As discussed above, Dr. Lemmer opined that Claimant should avoid repetitive use of the arms and legs, avoid lifting greater than 10 pounds, and have allowances for frequent absences from

work due to flares in pain and fatigue. (Tr. at 387.) He also noted that Claimant had difficulty with maintaining concentration, memory, and her energy level. (Id.) As discussed above, the ALJ properly determined that these limitations were not supported by the substantial evidence of record, and therefore, the even more stringent limitations as cited by Claimant likewise are unsupported by the evidence. Accordingly, the Court finds that the ALJ's hypothetical questions to the VE were proper and in accordance with the applicable law and Regulations. The ALJ's decision is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 14.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2009.

R. Clarke VanDervort
United States Magistrate Judge